***********
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based on the record of the proceedings before the Deputy Commissioner. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission hereby affirms the Opinion and Award with minor modifications.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the deputy commissioner hearing as
 STIPULATIONS
1. Employee is Glenn Carroll.
2. Employer is Town of Ayden.
3. The employer is a duly qualified self-insured employer at the time of the alleged occupational exposure claim.
4. Defendant-employer regularly employs three or more employees and is bound by the provisions of the North Carolina Workers' Compensation Act. The Industrial Commission has jurisdiction over the parties and all parties have been properly named in this action. The employer-employee relationship existed between the employer and the employee on October 19, 1998.
5. Plaintiff's average weekly wage was $756.06, which generates a compensation rate $504.04.
In addition, the parties stipulated into evidence two packets of documents which included Industrial Commission forms, medical reports and discovery responses.
The Pre-Trial Agreement dated July 6, 2001 which was submitted by the parties is incorporated by reference.
 ***********
Based upon all of the competent evidence in the record, the Full Commission makes the following
 FINDINGS OF FACT
1. Plaintiff is fifty-one years old, has a GED, has numerous certifications in water and sewage treatment courses and has an electrical license. He began working for the Town of Ayden in February 1980 in the water and sewer department. His job duties included installing and repairing water and sewer pipes, maintaining and repairing pump or lift stations, removing clogs and blockages, cleaning grease from the walls and pumps, and otherwise performing labor associated with maintaining the water and sewer systems of the town.
2. When working with the existing sewers and lift stations, plaintiff was regularly exposed to raw sewage, which included water, urine, feces, grease, tampons, prophylactics and anything else that people would flush down a toilet. He had seen syringes in the sewage, as well, but had never specifically seen a needle, although the sewers were dimly lit and there was usually grease on the surface of the water.
3. When he was first employed, plaintiff was provided a rain suit, rubber boots and leather gloves. However, the gloves would become saturated and sewage would sometimes come over the cuff and into the glove. There were also some occasions when he would have to squat down and sewage would come over the top of his boots. In the course of performing his work duties, he was often exposed to sewage against his skin. He also got some in his mouth or in his eyes on occasion, and he had some sewage showers.
4. The system was poorly maintained when plaintiff started working for the town. However, over the years improvements were gradually made to the process and employees were provided with more protection. By 1984 when plaintiff became a foreman, rubber gloves were provided which were longer and which would not become saturated. However, they would sometimes puncture. The workers were also given goggles to protect their eyes. Despite the additional protection and the fact that he spent less time in the sewers as a foreman, plaintiff would still on occasion be in direct contact with untreated sewage.
5. Plaintiff was subsequently promoted to water and sewer superintendent. In that position, he was much more involved with supervisory functions. In addition, by 1992 the system had been upgraded so that there were significantly fewer problems and blockages. However, he would still have to go into the sewers periodically in order to deal with some sort of problem and would still on occasion have direct contact with the sewage. He remained employed in this capacity as of the date of hearing. However, it appeared to have been at least a year since he had worked in a sewer as of the date this case was heard.
6. Plaintiff was first aware that he had some liver problems in 1992 when he saw Dr. Galloway for a complete physical and the liver function tests came back elevated. Dr. Galloway instructed him to stop drinking alcohol and then repeated the liver profile. The doctor also ordered a hepatitis diagnostic panel which tested for Hepatitis A and B, and the results were negative. The liver panel improved over the course of six weeks when plaintiff was not drinking any alcohol, so he was advised to stop drinking it altogether.
7. After September 1992 when given the last test results, plaintiff sought no further evaluation or treatment for possible liver problems. However, on September 21, 1998 he had to undergo blood tests before receiving a prescription for an unrelated problem, and the liver function tests again came back significantly abnormal. Dr. Ribeiro, who was seeing him at that time, then referred him to Dr. Newton for further evaluation. Dr. Newton, an internist and gastroenterologist, examined plaintiff on October 14, 1998 and ordered a battery of tests. The test results indicated that plaintiff had Hepatitis C. Plaintiff's iron level was also high. Dr. Newton then ordered a liver biopsy and it revealed moderate inflammation with significant fibrosis. However, there was no increased iron level, which ruled out one of the potential causes for the abnormal liver function tests.
8. On November 9, 1998 Dr. Newton wrote plaintiff a note stating that he had been diagnosed with Hepatitis C, a chronic viral infection of the liver, that he had probably acquired this infection in his work due to contact with sewer water and that he had probably had the illness for about six years. Dr. Newton did not research the medical literature regarding the risk of acquiring Hepatitis C for sewer workers to determine whether his opinion was scientifically accepted. Rather, Dr. Newton concluded that plaintiff contracted the disease in the course of his employment because there was blood in the sewage, plaintiff would have worked at times with cuts or abrasions, and plaintiff denied all of the activities which would normally lead to transmission of the disease.
9. Dr. Newton prescribed treatment with Interferon and Ribavirin, medications which had undesirable side effects but which could potentially lower the level of virus cells in the blood. Plaintiff took the medication for at least six months and suffered from fatigue, headaches, muscle aches and some nausea. By June 1999 the virus level had dropped significantly. However, it increased drastically by October 1999 so the treatment was discontinued. Although plaintiff was monitored periodically thereafter, no further treatment was pursued. Dr. Newton subsequently discussed with plaintiff a new treatment protocol, but he was not interested in undergoing the new treatment program because the treatment would involve similar unpleasant side effects.
10. Because Dr. Newton attributed plaintiff's hepatitis to his exposure to sewage at work, plaintiff filed this workers' compensation claim. Defendant then presented the issue to Dr. Campbell, an internist and infectious disease specialist who had worked for the Center for Disease Control for two years during his career. Dr. Campbell searched the medical literature and found no studies which showed Hepatitis C to be present in sewage or that sewage could transfer the virus. There was no scientific evidence to support the theory that sewer workers were at an increased risk of acquiring the infection and, in view of the large number of sewage systems and sewer workers, the doctor was of the opinion that the risk would have been noticed if it existed. Despite the large number of patients he had treated for Hepatitis C, Dr. Campbell had never had a patient claim to have contracted the disease from exposure to sewage.
11. Dr. Campbell explained that Hepatitis C is a virus which is transmitted through a blood borne route. Once inside the body, it resides primarily in the liver causing inflammation. The virus may ultimately lead to cirrhosis and end-stage liver disease. It can also cause liver cancer. However, many people live with the condition for decades without progressing to a severe condition. Hepatitis C is usually transmitted by shared intravenous needles, but there have been less frequent reports of sexual transmission and rare cases of cuts or punctures allowing the virus to enter the blood stream when exposed to infected blood. Greater exposure to infected blood is required for the transmission of Hepatitis C than for the transmission of Hepatitis B. In addition, the Hepatitis C virus has a very short life span outside of the host, which has hampered research since it cannot be cultured. The fact that the Hepatitis C virus does not survive long outside the host renders transmission through sewer waste unlikely. There has been considerable effort in medicine to identify the routes of transmission for Hepatitis C. Contact with sewer waste has not been identified as a potential cause for Hepatitis C.
12. Dr. Newton was too quick to attribute plaintiff's condition to his exposure to sewage. Not only did Dr. Newton not have scientific authority to support his opinion, he could not base his opinion on his own experience in medical practice since he had not treated another sewer worker for Hepatitis C. In addition, as noted by Dr. Campbell, there are disincentives for patients to disclose the types of activities which could lead to infection.
13. Although plaintiff was exposed to untreated sewer water which would have contained some blood and although he worked at times with cuts or abrasions on his skin, he has not proven by the greater weight of the evidence to have been placed at an increased risk of developing Hepatitis C by reason of his exposure to untreated sewage in his employment with defendant. Nor was his exposure to untreated sewage proven to have been a significant contributing factor in his contraction of the disease.
14. Plaintiff has not proven that he developed an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment with defendant-employer and which excluded all ordinary diseases of life to which the general public was equally exposed.
15. To his knowledge, plaintiff never had an incident where he was stuck by a needle while performing his job duties. He therefore did not prove that he sustained an injury by accident arising out of and in the course of his employment which resulted in his contraction of Hepatitis C.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following
 CONCLUSIONS OF LAW
1. Plaintiff's Hepatitis C was not an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment with defendant-employer and which excluded all ordinary diseases of life to which the general public was equally exposed. G.S. § 97-53 (13); Booker v. Duke Medical Center, 297 N.C. 458 (1979). Dr. Newton's bald opinion is not accepted as credible evidence of causation because his opinion is not based on accepted medical principles of differential diagnosis and is not supported by the accepted medical literature. See Daubert v. Merrell Dow Pharmaceuticals, Inc.,509 U.S. 579, 113 S.Ct. 2786 (1993); Westberry v. Gislaved Gummi AB,178 F.3d 257 (4th Cir. 1999); Young v. Hickory Business Furniture,353 N.C. 227, 538 S.E.2d 912 (2000); Smith v. Beasley Enterprises, ___ N.C. App. ___, ___ S.E.2d ___, No. COA01-325 (2002).
2. Plaintiff was not proven to have sustained an injury by accident arising out of and in the course of his employment which resulted in his contraction of Hepatitis C. G.S. § 97-2 (6).
3. Plaintiff is not entitled to benefits under the Workers' Compensation Act for his Hepatitis C. G.S. § 97-2 et seq.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Plaintiff's claim for workers' compensation benefits is hereby DENIED.
2. Each side shall pay its own costs.
 S/______________ RENE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER