**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-2267**

DEBORAH ZELLERS,

       Plaintiff - Appellant,

    v.

NEXTECH NORTHEAST, LLC,

       Defendant – Appellee,

    v.

RITE AID OF VIRGINIA, INC.,

       Third Party Defendant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Gerald Bruce Lee, District Judge. (1:11-cv-00967-GBL-TRJ)

Submitted: June 7, 2013          Decided: July 17, 2013

Before NIEMEYER, SHEDD, and THACKER, Circuit Judges.

Affirmed by unpublished per curiam opinion.

Davis Hilton Wise, WISE & DONAHUE, PLC, Fairfax, Virginia, for Appellant. Michael Allweiss, ALLWEISS & ALLWEISS, St. Petersburg, Florida; Daniel D. Barks, THE LAW OFFICE OF DANIEL D. BARKS, Alexandria, Virginia; Ellis R. Lesemann, Amanda M.

Blundy, HARVEY & VALLINI, LLC, Mt. Pleasant, South Carolina, for
Appellee.

————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In this negligence action brought by Appellant Deborah Zellars ("Ms. Zellars") against NexTech Northeast LLC ("NexTech"), an HVAC contractor, Ms. Zellars proffered three expert witnesses to testify that she was injured by allegedly excessive exposure to refrigerant gas at her place of employment, a Rite Aid in Arlington, Virginia. The district court excluded the testimony of each proffered expert, leaving Ms. Zellars without any expert testimony on the element of causation. Accordingly, the district court granted summary judgment in favor of NexTech. On appeal, Ms. Zellars asserts that the district court abused its discretion in excluding the testimony of each of the three proffered causation experts and that, therefore, the district court also erred in granting summary judgment in favor of NexTech. However, because we agree with the district court that none of Ms. Zellars's three proffered causation experts offered relevant or reliable scientific testimony, we affirm.

I.

Appellant Ms. Zellars worked as a shift supervisor at a Rite Aid store in Arlington, Virginia (the "Arlington Rite Aid"). Her duties included, among other things, rearranging and organizing retail products displayed in retail display freezers located throughout the store. Appellee NexTech is a commercial

3

contractor that works in the heating, cooling, and refrigeration business.  During all relevant times, NexTech had a contract with Rite Aid pursuant to which NexTech would maintain and, as necessary, repair refrigerators at several area Rite Aid stores.

On September 9, 2009, NexTech responded to a service call related to a perceived refrigerant leak.  On that visit, NexTech added a disputed quantity of R-404A Freon ("R-404A") refrigerant to the freezer in question.[1]  Two days later, on September 11, 2009, NexTech again responded to a service call from the Arlington Rite Aid about the same freezer.  However, during this visit, NexTech determined that the freezer was functioning appropriately and, as a result, did not take any corrective action.

Less than one week later, on September 16, 2009, Carrie Hare, the manager of the Arlington Rite Aid, placed a call to the Arlington Fire Department indicating that Rite Aid employees had been complaining of headaches and other symptoms for a period of "weeks" and suggesting this condition was caused by a leak in the previously-serviced freezer.  Members of the

---

[1] Based on an ambiguous billing entry, Ms. Zellars contends that NexTech added 25 lbs. of R-404A refrigerant to the system while NexTech contends that it merely added 2.5 lbs.  While the parties vigorously disputed this issue both below and in their briefs, the resolution of this factual dispute is unnecessary to our disposition of this appeal.

4

fire department's hazardous materials team proceeded to the store, where they detected a small leak in the freezer.[2] After the hazardous materials team had completed its assessment, a call was placed to NexTech, who responded by dispatching a technician to the store. The technician determined that a valve on the refrigerator was leaking refrigerant gas and repaired the leak.

Minutes before the NexTech technician finished repairing the freezer, Ms. Zellars reported to work. Soon after arriving, she reported to Ms. Hare that she was feeling ill, specifically complaining of shortness of breath, dizziness, and a headache. In response, Ms. Zellars was taken to the local emergency room, where she was diagnosed with anemia. Her treating physicians then offered her a blood transfusion, which she refused, indicating that her condition had improved.

Ms. Zellars and Ms. Hare commenced the present action in the United States District Court for the Eastern District of Virginia in 2011,[3] alleging that NexTech had breached its common law duty of care in failing to properly service the freezer and

---

[2] At that time, the hazardous materials team members also noted that oxygen levels in the store around the freezer were normal. Accordingly, they opted not to close the store.

[3] Ms. Hare's action was disposed of in the same order as Ms. Zellars's; however, only Ms. Zellars's case is presently before us on appeal.

in failing to detect and repair the refrigerant leak before September 16, 2009. Additionally, the complaint alleges that this breach proximately caused a variety of personal injuries, and plaintiffs proffered testimony from each of their treating physicians and other experts in attempt to support this assertion.

Of relevance to the present appeal, Ms. Zellars offered written reports and deposition testimony from the following expert witnesses: (1) Dr. Vandana Sharma, M.D., Ms. Zellars's treating physician, who opined that Ms. Zellars's condition was caused by exposure to a neurotoxin, possibly a refrigerant gas;[4] (2) Dr. Robert Simon, Ph.D., a chemist who testified that Ms. Zellars had experienced symptoms that were consistent with the adverse health effects of overexposure to R-404A refrigerant; (3) Dr. Raymond Singer, Ph.D., a neurotoxicologist who testified that Ms. Zellars's symptoms were both consistent with and caused by exposure to R-404A; and (4)

---

[4] In her initial report, Dr. Sharma specifically opined that Ms. Zellars's condition was caused by refrigerant gas exposure. However, as the district court observed, Dr. Sharma backed away from that statement at her deposition, testifying only that Ms. Zellars's condition was caused by neurotoxin exposure and that refrigerant gas was merely one possible source. Zellars v. NexTech Northeast, LLC, 895 F. Supp. 2d 734, 746 (E.D. Va. 2012) ("Dr. Sharma maintains that Ms. Zellars's neurological condition was caused by some toxicity or toxic event, but she no longer offers exposure to refrigerant gas as the specific cause to a reasonable degree of medical certainty.")

6

Ronald Bailey, an HVAC engineer who testified that NexTech had breached the applicable standard of care in its maintenance of the display refrigerators.

In response, NexTech filed several motions, including motions in limine to exclude the testimony of each of the plaintiffs' proffered experts, and a motion for summary judgment. The plaintiffs filed a motion for sanctions, requesting an adverse inference based on NexTech's alleged spoliation of evidence.[5] The district court held a hearing on all of these motions on July 13, 2012.

On July 19, 2012, the district court granted NexTech's motions as to three of the four proffered experts: Dr. Sharma, Dr. Simon, and Dr. Singer. This left Ms. Zellars without any expert testimony on the issue of causation. Thus, the district court determined that Ms. Zellars could not sustain her burden to prove that her injuries were caused by NexTech's alleged negligence and, therefore, granted NexTech's motion for summary judgment. Finally, the district court denied Ms. Zellars's

---

[5] Specifically, Ms. Zellars points to the fact that, on August 24, 2011, NexTech "evacuated" the disputed freezer, removing and replacing all of the existing refrigerant. Ms. Zellars argues that this amounts to spoliation of the evidence, as the type of refrigerant in place in the system in September 2009 is relevant to its case. Accordingly, Ms. Zellars requested the district court to permit an adverse inference against NexTech.

7

motion for sanctions as moot. Ms. Zellars timely noted this appeal.

## II.

We review a district court's award of summary judgment de novo. Dooley v. Hartford Acc. & Indem. Co., 716 F.3d 131, 135 (4th Cir. 2013). However, we review a district court's decision to admit or exclude evidence, including expert testimony, for an abuse of discretion. Belk, Inc. v. Meyer Corp., U.S., 679 F.3d 146, 161 (4th Cir. 2012). Similarly, a district court's refusal to apply an adverse inference based on a party's alleged spoliation of evidence "must stand unless it was an abuse of its broad discretion in this regard." Vulcan Materials Co. v. Massiah, 645 F.3d 249, 260 (4th Cir. 2011) (citations omitted).

## III.

### A.

### Expert Testimony

Ms. Zellars first argues that the district court abused its discretion in excluding the testimony of Dr. Sharma, Dr. Singer, and Dr. Simon. In toxic tort cases, "[i]n order to carry the burden of proving a plaintiff's injury was caused by exposure to a specified substance, the plaintiff must demonstrate the levels of exposure that are hazardous to human beings generally as well as plaintiff's actual level of

8

exposure." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 263 (4th Cir. 1999) (internal citations and quotations marks omitted).[6] Generally, this must be done through the use of relevant and reliable expert testimony. See, e.g., Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001) ("[A]ll of Cooper's claims required expert medical testimony that the Rogozinski System was the proximate cause of his injuries[.]")

Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert witness testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Pursuant to this rule, the trial judge is assigned the task of "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 588 (1993).

---

[6] These two levels of causation are known as "general causation" and "specific causation." See, e.g., Bourne ex rel. Bourne v. E.I. Dupont de Nemours & Co., Inc., 189 F. Supp. 2d 482, 485 (S.D. W. Va. 2002) ("In a toxic tort case, a plaintiff must generally establish both general and specific causation for his injuries."), aff'd, 85 F. App'x 964 (4th Cir. 2004).

This involves a two-pronged inquiry. First, the district court must determine whether the proffered expert testimony concerns scientific knowledge. Second, the district court must determine whether that testimony will assist in the determination of a fact in issue. Daubert, 509 U.S. at 592. In other words, "[t]he first prong of this inquiry necessitates an examination of whether the reasoning or methodology underlying the expert's proffered opinion is reliable," and "[t]he second prong of the inquiry requires an analysis of whether the opinion is relevant to the facts at issue." Westberry, 178 F.3d at 260.

Applying this test to the facts at hand, the district court concluded that the testimony of each of the three proffered causation experts was unreliable and, therefore, inadmissible. We agree on all counts.

1.

Exclusion of Dr. Sharma

Dr. Sharma is a board certified neurologist who maintains a practice in general neurology. In a report completed on February 24, 2012, Dr. Sharma indicated that she first evaluated Ms. Zellars in August 2011 for neck and back pain, muscle tenderness and stiffness, jerking of the extremities, body tremors, and other symptoms. In that report, Dr. Sharma opined, to a reasonable degree of medical certainty, that Ms. Zellars's symptoms were caused by exposure to R-404A

10

refrigerant gas in September 2009. However, at her subsequent deposition, Dr. Sharma softened this testimony, opining instead that Ms. Zellars's condition was caused by a toxic event but declining to specifically identify the chemical involved. J.A. 403 ("[T]oxicity is a reasonable medical certainty. Is it related to Freon itself, I cannot opine on that.").[7] Despite Dr. Sharma' equivocal testimony, Ms. Zellars maintains, both before the district court and on appeal, that Dr. Sharma's testimony is sufficiently relevant and reliable. We disagree.

First, as the district court held, Dr. Sharma lacks the requisite qualifications to offer expert testimony in the field of toxicology. Dr. Sharma is a neurologist. By her own admission, she does not have any specialized training in the field of toxicology. J.A. 404 (Dr. Sharma: "I do not have any training in toxicology."). This is further evinced by the fact that, during her deposition, Dr. Sharma indicated that her knowledge of refrigerant gas toxicity primarily came from a survey of scientific articles downloaded from the internet.

Ms. Zellars argues that Dr. Sharma's lack of toxicology expertise is immaterial, as her testimony is offered along with the testimony of Dr. Singer and Dr. Simon, both of

---

[7] Citations to the Joint Appendix ("J.A.") refer to the joint appendix filed by the parties in this appeal.

11

whom have more training in the field of toxicology. While it is true that there is no prohibition on utilizing multiple experts to establish various components of a party's case, this does not change Daubert's command that an expert's testimony must be based on "more than subjective belief or unsupported speculation." Daubert, 509 U.S. at 590. Because she lacks specific training in the field in which she seeks to testify, and because she was unable to state with specificity that any of Ms. Zellars's alleged injuries were caused by exposure to refrigerant gas, Dr. Sharma simply cannot overcome this hurdle.

Second, the district court properly held that Dr. Sharma's methodology was not sufficiently reliable. Dr. Sharma employed a method known as "differential diagnosis" in evaluating Ms. Zellars. Differential diagnosis is "a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." Westberry, 178 F.3d at 262. Typically, a differential diagnosis "is performed after physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests." Id. When performed properly, expert testimony employing this methodology is admissible. Westberry, 178 F.3d at 263 ("We previously have upheld the admission of an expert opinion on causation based upon a differential diagnosis.")

12

However, in this case, Dr. Sharma did not reliably apply the differential diagnosis technique. As the district court observed, Dr. Sharma could not even identify the intensity and duration of Ms. Zellars's exposure R-404A. See, e.g., J.A. 448 ("[Dr. Sharma]: She put that she was exposed for a duration of time for several weeks or months going into the freezer multiple times. But . . . I'm not able to opine on that because I don't know the exact exposure.") While it is true, as Ms. Zellars argues, that precise information regarding a plaintiff's level of exposure "is not always available, or necessary[,]" Westberry, 178 F.3d at 264,[8] it is also true that a "plaintiff must demonstrate the levels of exposure that are hazardous to

---

[8] Ms. Zellars's reliance on Westberry on this point is inapposite. Specifically, in Westberry, we held that the plaintiff's expert did not need to cite specific quantitative evidence regarding the plaintiff's level of exposure because the record in that case clearly established that the plaintiff had been substantially exposed to the allegedly harmful substance in such a way that specific evidence was unnecessary. Westberry, 178 F.3d at 263. In particular, the allegedly harmful substance in that case was talc powder, and the record was replete with evidence of the plaintiff's substantial exposure to talc. See, e.g., id. at 264 ("Westberry testified that the talc that settled from the air around his work area was so thick that one could see footprints in it on the floor. He further stated that he worked in clouds of talc and that it covered him and his clothes.") Here, there is no evidence of such substantial exposure. Thus, Westberry does not support Ms. Zellars's claim that she need not put forth specific evidence regarding her level of exposure.

human beings generally as well as the plaintiff's actual level of exposure." Id. at 263.

Thus, the district court did not abuse its discretion in excluding her testimony.

2.

Exclusion of Dr. Simon

Dr. Robert K. Simon is an expert in analytical chemistry, toxicology, and environmental assessment. His opinion was offered to establish that Ms. Zellars was exposed to excessive levels of R-404A and that she experienced symptoms consistent with such exposure. The district court held, and we agree, that Dr. Simon's proffered testimony is inadmissible under Daubert.

First, Dr. Simon has no scientific or technical knowledge that qualifies him to offer expert testimony in this case. While Dr. Simon is a toxicologist, he has no expert training with regard to the toxicity of refrigerants. Moreover, by his own admission, Dr. Simon does not know the level of R-404A exposure that would be necessary to cause Ms. Zellars's alleged health effects. J.A. 297 ("But what the dose would be that is required for Ms. Zellars to respond, I have no calculations on."). Rather, he simply asserts, without scientific support, that refrigerant exposure can be deadly under certain circumstances. Similar to Dr. Sharma, Dr. Simon's

14

lack of expert knowledge on the subject of refrigerant toxicity renders his testimony entirely speculative and, therefore, inadmissible under <u>Daubert</u>.

Dr. Simon also fails to identify any facts or data regarding Ms. Zellars's level of R-404A exposure. In his initial report, Dr. Simon opined that the concentration of R-404A in the freezer "reached multiples of 1000 parts per million on numerous occasions due to the leaking Shrader valve, particularly between September 9, 2009 and September 16, 2009." J.A. 1865 (alterations omitted). Dr. Simon based this opinion on the report of the engineering expert, Ronald Bailey. However, by his own admission, Dr. Simon did not review Mr. Bailey's calculations as to the concentration of R-404A in the freezer. J.A. 290 ("[Defense Counsel]: Have you seen Mr. Bailey's calculations? [Dr. Simon]: No, I have seen his report. [Defense Counsel]: But no calculations? You've not seen any calculations? [Dr. Simon]: He hasn't provided me with any calculations."). Additionally, Dr. Simon indicated that he did not know how much time Ms. Zellars spent working in the freezer. J.A. 184 ("[Defense Counsel]: Did she give you a time estimate of how much time she spent [working in the freezer] or a percentage? [Dr. Simon]: No, all she would say is this is what I did when I came into work."). Thus, he has no reliable basis for determining the level of Ms. Zellars's R-404A exposure.

15

Ms. Zellars argues that, in formulating his opinion, Dr. Simon permissibly relied on the testimony of Mr. Bailey to ascertain the level exposure in this case. However, the portion of Dr. Simon's opinion that is based on Mr. Bailey's work does not speak to Ms. Zellars's level of exposure. Rather, it simply speaks to the levels of R-404A that were present in the freezer. Thus, even assuming Mr. Bailey's calculations are accurate, Dr. Simon's opinion was not based on any specific information regarding Ms. Zellars's level of R-404A exposure.

Accordingly, the district court did not abuse its discretion in excluding Dr. Simon's testimony.

3.

Exclusion of Dr. Singer

Dr. Raymond Singer, Ph.D., is a neuropsychologist and neurotoxicologist whose opinion was offered to show that Ms. Zellars "has a nervous system dysfunction from neurotoxicity consistent with and caused by poisoning with refrigerant containing fluorocarbons." J.A. 1866 (alterations omitted). Thus, unlike Dr. Simon, who merely testified that Ms. Zellars's symptoms were consistent with excessive R-404A exposure, Dr. Singer goes a step further by indicating that Ms. Zellars's condition was, in fact, caused by her exposure to R-404A in the Arlington Rite Aid.

16

However, as the district court properly held, Dr. Singer is not qualified to diagnose the cause of Ms. Zellars's alleged symptoms. Dr. Singer is not a medical doctor. Moreover, Dr. Singer did not arrive at his own medical opinion. Instead, he based his opinion on Dr. Sharma's initial report. J.A. 1036 ("[Dr. Singer]: I'm relying on Dr. Sharma to offer a neurological opinion about the cause of Ms. Zellars's conditions."). However, as discussed above, Dr. Sharma is no longer of the view that Ms. Zellars's condition was caused by refrigerant gas exposure. Rather, Dr. Sharma's opinion is that R-404A exposure is one possible cause of Ms. Zellars's condition. Thus, the entire basis for Dr. Singer's opinion on specific causation has been undermined as merely speculative.

Accordingly, the district court did not abuse its discretion in excluding his testimony.

B.

Motion for Summary Judgment

Having excluded all three of Ms. Zellars's causation experts, the district court held that Ms. Zellars could not satisfy the causation element of her claim and, accordingly, granted NexTech's motion for summary judgment. We agree.

Summary judgment is appropriate if the available evidence reveals no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ.

17

P. 56(a).  The party moving for summary judgment bears the burden of establishing the absence of a genuine issue of material fact, and a reviewing court must draw all reasonable inferences and resolve all disputed factual matters in favor of the nonmoving party.  Carr v. Deeds, 453 F.3d 593, 608 (4th Cir. 2006).  Importantly, a complete failure of proof concerning an essential element of the plaintiff's case necessitates a grant of summary judgment in favor of the defendant.  Celotex Corp v. Catrett, 477 U.S. 317, 322-23 (1986).

In Virginia, "a plaintiff who seeks to establish actionable negligence must plead the existence of a legal duty, violation of that duty, and proximate causation which results in injury."  Kellermann v. McDonough, 684 S.E.2d 786, 790 (Va. 2009)(citations omitted).  To prove causation in a toxic tort action, a plaintiff must offer relevant and reliable expert testimony, as the health effects of toxic  exposure to chemicals are beyond the knowledge and experience of the average layperson.  Here, with the exclusion of all three of plaintiff's causation experts, there is a complete failure of proof on the critical element of causation.  Thus, the district court's grant of summary judgment was proper.[9]

---

[9] Because we affirm the district court's grant of summary judgment in favor of NexTech on the element of causation, we need not determine whether the district court properly denied (Continued)

18

## IV.

For the foregoing reasons, the judgment of the district court is affirmed. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

AFFIRMED

---

Ms. Zellars's motion for sanctions. Even if we were to permit an adverse inference to be drawn against NexTech for spoliation, that inference would go only toward the element of breach. It would not aid Ms. Zellars on the element of causation. Accordingly, because Ms. Zellars would still fail to establish this element regardless of the adverse inference, we do not address this issue.